United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| LIBERTY IRENE CULLEN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>ANDREW SAUL,<br><br>　　　　Defendant. | Case No. 18-cv-01576-RMI<br><br>**ORDER**<br><br>Re: Dkt. Nos. 20, 27 |

Plaintiff, Liberty Irene Cullen, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for benefits under Title II and Title XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 13), and both parties have moved for summary judgment (dkts. 20 & 27). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARD

Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108

F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On May 1, 2014, Plaintiff filed an application for benefits under Title II and Title XVI, alleging an onset date of May 8, 2014. *See Administrative Record* "AR" (dkt. 15) at 17. The ALJ denied the application on December 14, 2016. *Id*. at 17-29. The Appeals Council denied Plaintiff's request for review on January 8, 2018. *Id*. at 1-5.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff alleged that she suffers from the following physical and mental impairments: morbid obesity, kyphosis, asthma, bipolar disorder, major depressive disorder, posttraumatic stress disorder (PTSD), borderline intellectual functioning, hypothyroid disorder,[1] migraine headaches, gastroesophageal reflux disease (GERD), vertigo, Scheuermann's disease, hypersomnia, hiatal hernia, pes planus (flat-footedness) and inward toeing, chronic fatigue, oppositional defiant disorder (ODD), attention deficit disorder (ADD), and anxiety disorder. *See Pl.'s Mot.* (dkt. 20) at 8, 10, 19-20. The ALJ determined that Plaintiff's morbid obesity, kyphosis, asthma, bipolar disorder, major depressive disorder, PTSD, and borderline intellectual functioning were severe, but that Plaintiff's hypothyroid disorder was non-severe. *AR* (dkt. 15) at 19-20. In doing so, the ALJ omitted several well-documented impairments from the Step Two analysis: migraine headaches, GERD, vertigo, Scheuermann's disease[2], hypersomnia, hiatal hernia, pes planus and

---

[1] Although Plaintiff did not list hypothyroid disorder among the other impairments alleged in her motion, Plaintiff did provide medical evidence documenting hypothyroid disorder. *E.g. AR* (dkt. 15) at 1029, 1069-71, 1086, 1094, 1153, 1158.

[2] Scheuermann's disease is a developmental type of kyphosis. *A Patient's Guide to Scheuermann's Kyphosis*, University of Maryland Medical Center (July 22, 2019, 9:10 AM), https://www.umms.org/ummc/health-services/orthopedics/services/spine/patient-guides/scheuermanns-kyphosis. Therefore, when the ALJ determined that Plaintiff's kyphosis was a severe impairment (*see AR*

2

inward toeing, chronic fatigue, ODD, ADD, and anxiety disorder.

*Evidence Pertaining to Flat Footedness and Inward Toeing:*

In late June of 2014, Plaintiff's stepfather, Larry Rounds, completed a questionnaire on an SSA form entitled, "Function Report – Adult – Third Party." *Id*. at 318. In response to a question about how Plaintiff's illnesses, injuries or conditions affect her abilities, Mr. Rounds marked, in pertinent part, the Plaintiff's ability to stand, kneel, walk, squat, and climb stairs as affected by her conditions. *Id*. at 323. Also in June of 2014, Plaintiff submitted a similar questionnaire on a form entitled, "Function Report – Adult." *Id*. at 328. In response to an identical question about her abilities, Plaintiff marked "walking" and "lifting" as affected by her conditions. *Id*. at 333.

Several months later in February 2015, Plaintiff submitted a completed questionnaire on an SSA form entitled, "Disability Report – Appeal." *Id*. at 363. Among the first questions present on this form is an inquiry to the following effect: "Has there been any change (for better or worse) in your illness, injuries, or conditions since you last completed a disability report?" Plaintiff answered, in pertinent part, that she had "trouble walking for very far, [and] trouble standing." *Id.*

Testifying before the ALJ in September 2016, Plaintiff stated that her "feet are constantly hurting" (*id*. at 52), and that pain in the arch of her foot and heels prevent her from standing in line at the grocery store to the extent that she must "find somewhere to sit or . . . suffer through the pain" (*id*. at 53).

As to the medical evidence documenting flat footedness and inward toeing, Plaintiff submitted treatment and diagnostic records from her primary care physicians and nurse practitioners. In November 2014, Plaintiff's interim primary care physician, Neeta Hillman, MD, assessed that Plaintiff is "pigeon toed" and that her "ankle pain persists [and] makes it difficult to walk." *Id*. at 829, 834. Dr. Hillman then referred Plaintiff to "podiatry for help with footwear therapy." *Id*. at 834. This assessment was confirmed two years later in August 2016 by Plaintiff's subsequent primary care physician, David DeRose, MD, who noted toeing-in on Plaintiff's problem list. *Id*. at 1109.

---

(dkt. 15) at 19), the ALJ did not erroneously omit Scheuermann's disease from the Step Two analysis. Thus, Scheuermann's disease is excluded from the foregoing discussion of Step Two error.

3

1  Between February 2014 and August 2016, nurse practitioner Sandra Peeke assessed an "abnormal gait with pes planus and bilateral toeing in" (*id*. at 473, 642); noted that Plaintiff later "present[ed] for orthotics for pes planus" (*id*. at 1111); and repeatedly identified toeing-in and pes planus (*see, e.g., id*. at 1117, 1129-30, 1134-36, 1140, 1141, 1146). In 2016, physician assistant Debra Newman, chiropractic doctor Curtis Han, D.C., and nurse practitioner Julie Payette also identified toeing-in and pes planus. *See id*. at 1117, 1119, 1120, 1121, 1125, 1127.

### *Evidence Pertaining to Migraine Headaches:*

Plaintiff's October 2014 Disability Report asked, "Are you currently taking any medications for your illnesses, injuries, or conditions?" *Id*. at 345. Plaintiff responded, in pertinent part, that she took the prescription medication Atenolol for migraine headaches. *Id*. at 346. The next month, Plaintiff's mother, Nila Cullen-Rounds, submitted a similar questionnaire on a form entitled, "Function Report – Adult – Third Party." *Id*. at 351. Mrs. Cullen-Rounds described Plaintiff as handling stress poorly to the extent that she "gets a migraine." *Id*. at 357.

As to the medical evidence documenting migraine headaches, Plaintiff submitted treatment and diagnostic records from her primary care physicians. In February 2014, Plaintiff's primary care physician, Luis Diaz, MD, diagnosed headaches. *Id*. at 495-96. This diagnosis was confirmed throughout 2015 and 2016 when Plaintiff's subsequent primary care physician, Dr. DeRose, diagnosed Plaintiff with "chronic headache[s]" (*id*. at 1096) and noted that Plaintiff was "still troubled by [headaches]" that "wake her up out of sleep" (*id*. at 1095). Dr. DeRose also recorded Plaintiff's statement that her headaches felt like "someone hit me over that side of the head [with a] bat"; and that Plaintiff's headaches were sometimes accompanied by nausea and vomiting (recorded as "emesis"). *Id*. at 1049. Dr. DeRose ultimately prescribed Sumatriptan for Plaintiff's "migraine headaches." *Id*. at 1160. Even nurse practitioner Peeke, who provided Plaintiff with general medical care continuously from 2013, recorded that Plaintiff experienced headaches one to two times per week. *Id*. at 1111, 1134, 1141.

### *Evidence Pertaining to GERD:*

Plaintiff's October 2014 Disability Report asked, "Are you currently taking any medications for your illnesses, injuries, or conditions?" *Id*. at 345. Plaintiff responded, in pertinent

4

part, that she took the prescription medication Prilosec for GERD. *Id*. at 346.

As to the medical evidence documenting GERD, Plaintiff submitted treatment and diagnostic records dating as far back as 2013. In July 2013, Anna Brou, MD, noted that Plaintiff had a history of GERD "since infancy," that Plaintiff described her GERD as "worsening," and that Plaintiff took two prescription medications for GERD daily. *Id*. at 431-32. In October 2013, osteopathy doctor Ziad Hanna, DO, also diagnosed Plaintiff with "severe GERD" (*id*. at 423) and reiterated his assessment in a subsequent examination in late January 2014 (*id*. at 425-26).

Plaintiff also submitted more recent treatment and diagnostic records from her primary care physicians. In February 2014, Dr. Diaz diagnosed GERD (*id.* at 496) and filled Plaintiff's prescription medication for GERD (*id*. at 496, 671). This diagnosis was confirmed throughout 2016 by Plaintiff's subsequent primary care physician, Dr. DeRose, who documented Plaintiff pointing to her upper abdomen (recorded as "epigastrium") and stating, "it feels like someone is trying to pull my insides out"; noted that Plaintiff reported feeling abdominal pain all week, that the pain worsened when she ate, and that Plaintiff felt nauseous and vomited (recorded as "emesis"), which tasted of blood and appeared "pink tinged." *Id*. at 1039. Dr. DeRose also noted that Plaintiff had taken Prilosec "for at least three years," and that when he attempted to decrease Plaintiff's GERD medication "due to concerns with long term side effects," Plaintiff "immediately. . . started having more [symptoms]." *Id*. Furthermore, in August 2016, Dr. DeRose completed a questionnaire entitled "Physical Medical Source Statement," in which he reiterated his diagnosis of "severe GERD." *Id*. at 1101.

Notably, in May 2016, physician assistant Debra Newman recorded that Plaintiff experienced "intermittent trouble swallowing solids," that Plaintiff stated that she felt "like someone punched [her] in the stomach," and that Plaintiff had experienced abdominal pain for two consecutive weeks. *Id*. at 1115.

*Evidence Pertaining to Vertigo:*

In late June 2014, Mr. Rounds submitted a third-party function report that presented an inquiry to the following effect: "If the disabled person doesn't do house or yard work, explain why not." *Id*. at 321. Mr. Rounds answered, in pertinent part, that Plaintiff "gets dizzy." *Id*. In addition,

1   Plaintiff's October 2014 Disability Report asked, "Are you currently taking any medications for
2   your illnesses, injuries, or conditions?" *Id*. at 345. Plaintiff responded, in pertinent part, that she
3   took the prescription medication Meclizine for vertigo. *Id*. at 346.

Plaintiff also submitted treatment and diagnostic records from her primary care physicians dating as far back as 2013. In December 2013, Dr. Diaz identified vertigo among Plaintiff's "Chief Complaint[s]." *Id*. at 438. Later that month, Dr. Diaz recorded Plaintiff's statement that, for several months, "all the room [spun] around" her. *Id*. at 442. Dr. Diaz noted that Plaintiff's symptoms were "persistent" (*id.* at 442-43), diagnosed vertigo and referred Plaintiff to a neurologist (*id.* at 443, 457). Dr. Diaz reiterated her diagnosis several times throughout 2014. *E.g.*, *id.* at 458-59, 496, 670-71. Dr. Diaz's assessment was later confirmed by Plaintiff's interim primary care physician, Dr. Hillman, who identified vertigo as an active problem (*id.* at 747-49, 774-76, 819-821, 829-30) and by Plaintiff's subsequent primary care physician, Dr. DeRose, who noted that Plaintiff was "still having vertigo spells" in 2016 (*id.* at 1049).

Additionally, Plaintiff submitted treatment and diagnostic records from nurse practitioner Peeke, who provided Plaintiff with general medical care continuously since 2013, and from nurse practitioner Payette, who provided Plaintiff with mental health care continuously since 2013. Between December 2013 and August 2016, Ms. Peeke diagnosed vertigo (*id.* at 407-11) and identified vertigo as an active problem (*see id.* at 448-50, 460-62, 469-71, 475-77, 482-83, 488-90, 498-500, 504-06, 510-12, 519-21, 534-36, 543-45, 550-52, 557-59, 638-40, 646-48, 653-54, 660, 664, 675-77, 688-90, 694-96, 701-03, 707-09, 718-20, 731-33, 739-41, 755-57, 766-68, 811-12, 837-39, 936-38, 1001-02, 1008-10, 1129-30, 1134-136, 1141-43). Between May 2014 and August 2016, Ms. Payette also identified vertigo as an active problem. *See id.* at 726-27, 728-29, 763-64, 826-27, 844-46, 931-32, 998-99, 1025-26, 1028-29, 1037, 1062, 1069, 1077, 1080, 1085-86, 1092-93, 1097-98, 1099-100, 1113-14, 1126-27.

*Evidence Pertaining to Hiatal Hernia:*

Plaintiff's October 2014 Disability Report requested a list of those providers "who may have medical records or other information about [the claimant's] illnesses, injuries, or conditions since [the claimant] last completed a disability report." *Id*. at 344. Plaintiff responded, in pertinent

part, that she visited the Clearlake Family Health Center due to "hyatal (sic) hernia," for which Plaintiff received testing, a diagnosis, medication, and a referral to specialists. *Id.*

Plaintiff also submitted treatment and diagnostic records from her primary care physician and nurse practitioners. In late August 2016, Plaintiff's primary care physician, Dr. DeRose, diagnosed hiatal hernia. *Id*. at 1110. Prior to Dr. DeRose's diagnosis, nurse practitioner Peeke recorded that Plaintiff "has a hiatal hernia" (*id*. at 1111, 1134, 1141), and repeatedly identified hiatal hernia as an active problem (*id*. at 1112, 1128-30, 1134-36, 1141-43). In 2016, nurse practitioner Payette also identified hiatal hernia as an active problem. *Id*. at 1126-27.

*Evidence Pertaining to Hypersomnia and Chronic Fatigue:*

Plaintiff's medical records discuss the symptoms of hypersomnia and chronic fatigue in tandem; therefore, the court will address these impairments together.

During Plaintiff's hearing before the ALJ in September 2016, the ALJ asked whether Plaintiff received special accommodations—such as taped lectures or note-taking assistance—while attending college. *Id*. at 61. When Plaintiff responded in the negative, the ALJ asked, "[d]o you think that might have helped you in the class if you had gotten some special help?" *Id*. Plaintiff answered, "I don't know. . . I fall asleep in the—I fell asleep in the class a couple times and it kind of made [the instructor] mad. So, I don't know if that would help." *Id.*

As to the medical evidence documenting hypersomnia and chronic fatigue, Plaintiff submitted treatment and diagnostic records from her primary care physician and nurse practitioners. Between May 2015 and December 2015, Plaintiff's primary care physician, Dr. DeRose, recorded that Plaintiff "[felt] tired in general" (*id*. at 1058), had "physical issues with fatigue" (*id*. at 1081), and identified "hypersomnia" as an active problem (*id*. at 1059, 1073, 1081-82, 1109). Dr. DeRose also identified "excessive daytime sleepiness" on Plaintiff's problem list. *Id*. at 1109.

Dr. DeRose's diagnosis was confirmed by nurse practitioner Payette. Between February 2015 and August 2016, Ms. Payette identified hypersomnia as an active problem (*id*. at 1037, 1053, 1077, 1080, 1086, 1092-93, 1097, 1099, 1113-14, 1126-27); noted that Plaintiff experienced "fatigue" and "sluggishness" (*id*. at 1025-26, 1094); noted that Plaintiff slept "16 hours a day" (*id.*

7

at 1026); and wrote that her goal for Plaintiff was to have "adequate energy to complete her day's activities" (*id*. at 1029, 1100).

One month prior to Ms. Payette's first assessment, nurse practitioner Jennifer Clark noted that Plaintiff's "activity and energy remain low" (*id*. at 1015) or "below [Plaintiff's] baseline" (*id*. at 1017), and that Plaintiff presented hypersomnia (*id*. at 1018, 1024). Even Robin Patton, a licensed clinical social worker who met with Plaintiff in February 2014, noted that Plaintiff presented hypersomnia and recorded Plaintiff's statements that she "[didn't] have much energy" and slept "11 or 12 hours nightly." *Id*. at 673.

*Evidence Pertaining to ODD:*

In late June 2014, Mr. Rounds submitted a third-party function report that presented an inquiry to the following effect: "How do this person's illnesses, injuries or conditions limit his or her ability to work?" *Id.* Mr. Rounds answered that Plaintiff did "not [have] much or incomplete education" and listed several of Plaintiff's impairments, including ODD. *Id*. Mr. Rounds also listed ODD as one impairment that affects Plaintiff's ability to complete tasks, concentrate, understand, follow instructions, and get along with others. *Id*. at 323. Also submitted in June of 2014, Plaintiff's function report asked, "Do you have any problems getting along with family, friends, neighbors, or others?" *Id*. at 333. Plaintiff answered, in pertinent part, "some time's (sic) I argue with family and some people my age cuz (sic) there (sic) meen (sic)." *Id.* In response to a subsequent inquiry asking the claimant to "[d]escribe any changes in social activities since the illnesses, injuries, or conditions began," Plaintiff responded, "I never rilly (sic) had frinds (sic) becous (sic) I'll all wase (sic) been this way." *Id*.

As to the medical evidence documenting ODD, Plaintiff submitted treatment and diagnostic records from a consultative psychiatrist and nurse practitioner dating as far back as 2006. Pavitar Cheema, MD, conducted a comprehensive psychiatric evaluation of Plaintiff and diagnosed ODD in August 2006. *Id*. at 401. In his medical source statement, Dr. Cheema described Plaintiff's social interactions as "very poor," noting that Plaintiff was "unable to maintain social relationships" and required "constant supervision" because she "gets into fights and hurts other kids." *Id*. at 402. This was confirmed years later by nurse practitioner Peeke, who

8

repeatedly noted ODD in Plaintiff's medical history. *E.g.*, *id*. at 409, 471, 484, 490, 500, 506, 512, 640, 655, 664, 677, 690, 696, 720, 733, 813, 839, 1136, 1143.

*Evidence Pertaining to ADD:*

During Plaintiff's hearing before the ALJ in September 2016, the ALJ asked whether Plaintiff was "good at concentrating." *Id*. at 55. Plaintiff responded, "No. Not very good at it," and explained that ambient noises distracted her to the extent that she could not focus on reading a book or focus in school. *Id*. at 55-56.

In late June 2014, Mr. Rounds submitted a third-party function report that presented an inquiry to the following effect: "How do [the claimant's] illnesses, injuries or conditions limit his or her ability to work?" *Id.* at 318. Mr. Rounds answered that Plaintiff did "not [have] much or incomplete education" and listed several of Plaintiff's impairments, including ADHD. *Id*. Mr. Rounds also listed ADD as one impairment that affects Plaintiff's ability to complete tasks, concentrate, understand, follow instructions, and get along with others. *Id*. at 323. When presented with an identical inquiry in her third-party function report, Mrs. Cullen-Rounds responded, in pertinent part, that Plaintiff had a "very short attention span." *Id*. at 351.

Plaintiff's June 2014 function report also asked claimants to explain how their illness, injuries, or conditions limited their physical and mental abilities. *Id*. at 333. Plaintiff responded by marking her ability to understand, get along with others, concentrate, and complete tasks as affected. *Id*. Plaintiff explained, "I can't complet (sic) a task because I lose interest. I can't consintrat (sic) cuz (sic) there's a bunch of . . . noises." *Id*.

As to the medical evidence documenting ADD, Plaintiff submitted treatment and diagnostic records from primary care physicians and nurse practitioners. In December 2013, Dr. Diaz identified ADD as an active problem. *Id*. at 439. Between July 2014 and November 2014, Plaintiff's interim primary care physician, Dr. Hillman, continually identified ADD as an active problem. *Id*. at 747-49, 774-76, 819-20, 829-30. In August 2014, Dr. Hillman ordered a referral to reassess Plaintiff's ADD medication due to Plaintiff's concern that her medication was "not treating the ADD." *Id*. at 774, 782.

Additionally, Dr. Diaz and Dr. Hillman's assessments were confirmed by nurse

9

practitioners Peeke and Payette. Between December 2013 and August 2016, Ms. Peeke repeatedly identified ADD as an active problem. *See*, *e.g.*, *id*. at 448-50, 460-62, 469-71, 475-77, 482-83, 488-90, 498-500, 504-06, 510-12, 519-21, 534-36, 543-45, 550-52, 557-59, 638-40, 646-48, 653-54, 660, 664, 675-77, 688-90, 694-96, 701-03, 707-09, 718-20, 731-33, 739-41, 755-57, 766-68, 811-12, 837-39, 936-37, 1001-02, 1008-10, 1085-86, 1128-29, 1134-36, 1141-43. Between May 2014 and August 2017, Ms. Payette also identified ADD as an active problem. *Id*. at 726-27, 728-29, 763-64, 826-27, 844-46, 931, 998, 1025-26, 1028-29, 1037, 1062, 1069, 1077, 1080, 1092, 1097, 1099, 1113, 1126. Ms. Payette observed that Plaintiff experienced "symptoms of ADHD with difficulty focusing" in October 2014 (*id*. at 827) and reiterated her observation in March 2015 when she reported that Plaintiff's symptoms included "poor focus and concentration" (*id*. at 1097).

*Evidence Pertaining to Anxiety Disorder:*

Plaintiff submitted treatment and diagnostic records from her primary care physician and nurse practitioners that document an anxiety disorder. In a Physical Medical Source Statement submitted in August 2016, Dr. DeRose noted that he had diagnosed Plaintiff with anxiety. *Id*. at 1101. Prior to that diagnosis, between December 2013 and April 2014, nurse practitioner Peeke noted that Plaintiff presented anxiety (*id*. at 407, 675) and scored the maximum possible value for "moderate anxiety" on the Burns Anxiety Test (*id*. at 701-06, 713). Additionally, Ms. Peeke repeatedly identified "anxiety" and "insomnia due to anxiety and fear" as active problems. *Id*. at 1001-03, 1008-10, 1111-12, 1128-30, 1134-36, 1141-43. Between August 2014 and August 2016, nurse practitioner Payette noted that her goal for Plaintiff was the management of social anxiety and anxiety symptoms (*id*. at 728-29, 999); that Plaintiff was "frightened by being around people, chaos, and noise or a problem causing her to withdraw and isolate" (*id*. at 846); and identified "insomnia due to anxiety and fear" (*id*. at 1028-29, 1037, 1077, 1080, 1086, 1092, 1097, 1099, 1113-14, 1126-27). Between November 2014 and February 2015, nurse practitioner Clark recorded observations identical to those of Ms. Peeke and Payette. *See id*. at 943, 945-46, 950, 953, 958, 995, 1015-016, 1024. Ms. Clark noted that Plaintiff experienced "significant chronic anxiety likely [related to] PTSD" (*id*. at 923) and recommended that Plaintiff practice daily breathing exercises and meditation to reduce stress and anxiety (*id*. at 946, 996).

## THE FIVE-STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[3] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id.* § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown* v. *Heckler*, 713 F.2d 441, 443 (9th Cir. 1983). Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* (dkt. 15) at 17-19. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. *AR* (dkt. 15) at 19.

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: morbid obesity, kyphosis, asthma, bipolar disorder, major depressive disorder, PTSD, and borderline intellectual functioning. *AR* (dkt. 15) at 19. The ALJ found that Plaintiff also suffered the non-severe impairment of hypothyroidism. *Id*. at 19-20.

---

[3] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* (dkt. 15) at 20. Next, the ALJ determined that Plaintiff retained the RFC "to perform sedentary work" with several physical limitations. *Id*. at 22-27.

At Step Four, the ALJ determined that Plaintiff had no past relevant work, but upon considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform some "jobs that exist in significant numbers in the national economy," such as Bench Hand Worker, Machine Operator (Label Maker), or Addressor. *Id*. at 27-28. Thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 8, 2014, through December 14, 2016, the date of the ALJ's decision. *Id*. at 29.

## ISSUES PRESENTED

Plaintiff presents seven issues for review. The first assigns error to the ALJ's failure to consider and assess numerous diagnosed impairments. *Pl.'s Mot.* (dkt. 20) at 19-20. Plaintiff's second issue assigns error to the ALJ's failure to consider applicable listings and assess the effect of Plaintiff's combined impairments. *Id* at 20. Plaintiff's third issue assigns error to the ALJ's rejection of the opinion of Plaintiff's treating physicians and to the treatment of the longitudinal medical record. *Id*. at 23-28. Plaintiff's fourth issue assigns error to the ALJ grating great weight to state agency psychological consultants. *Id*. at 28. Plaintiff's fifth issue assigns error to the ALJ's treatment of Plaintiff's testimony. *Id*. at 28-30. Plaintiff's sixth issue assigns error to the ALJ's treatment of Plaintiff's mother and stepfather's testimonies. *Id*. at 30-31. Plaintiff's seventh issue assigns error to the ALJ's hypotheticals and his treatment of the vocational expert's testimony. *Id*. at 31-32.

//

**DISCUSSION**

The court will address Plaintiff's first issue because its assignment of error involved the earliest point of the sequential evaluation process. In her first issue, Plaintiff contends that the ALJ erred at Step Two by failing to evaluate, or even mention, her migraine headaches, GERD, vertigo, hypersomnia, hiatal hernia, pes planus and inward toeing, chronic fatigue, ODD, ADD, and anxiety disorder. *Id*. at 19-20. Defendant does not expressly concede this assertion of fact, but does not appear to dispute it either. *See Def.'s Mot.* (dkt. 27) at 13-15. Instead, Defendant submits several arguments: (1) that Plaintiff only identified PTSD, ODD, bipolar disorder, and kyphosis in her completed Disability Report (*id*. at 13); (2) that Plaintiff cites no authority for the assertion that the ALJ is "required to assess whether each and every medical impairment identifiable from the record is severe" (*id*. at 14) (*citing Pl.'s Mot.* (dkt. 20) at 12); (3) that the ALJ "noted that the records referenced other medically determinable impairments, but . . . did not find any additional severe impairments" (*id*.); (4) that Plaintiff failed to show that the allegedly ignored conditions are "severe impairments" that "*significantly limit* [Plaintiff's] physical or mental ability to do basic work activities" (*id.*) (emphasis in original); and (5) that even if the ALJ could have identified additional severe impairments at Step Two, such an oversight is of "no consequence" absent any showing of deficiency in the RFC (*id*.).

**Step-Two Error**

The court has carefully reviewed the ALJ's decision and finds that the ALJ erred when she failed to analyze Plaintiff's migraine headaches, GERD, vertigo, hypersomnia, hiatal hernia, pes planus and inward toeing, chronic fatigue, ODD, ADD, and anxiety disorder at Step Two. *See AR* (dkt. 15) at 19-20). Indeed, the ALJ's Step Two analysis yields not a single instance in which any of these conditions are mentioned. *See id*.

Defendant first responds to Plaintiff's assertion of Step Two error by arguing that Plaintiff's Disability Report "identified just four conditions: PTSD, ODD, bipolar disorder, and kyphosis." *Def.'s Mot.* (dkt. 27) at 13. Defendant attempts to avoid the shortcoming in the ALJ's decision by focusing the inquiry on evidence elsewhere in the record offered as a *post hoc* justification for the ALJ's failure to render any Step Two findings regarding the above-mentioned

13

impairments. Binding precedent precludes the ALJ from ignoring evidence of an impairment presented by Plaintiff. *See Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (error for an ALJ to ignore competent evidence in the record in order to justify his conclusion); *and Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982) ("[A]n ALJ must weigh all the evidence and may not ignore evidence that suggests an opposite conclusion.") (citation omitted); *see also* 20 C.F.R. § 404.1520(a)(3) ("We will consider *all evidence* in your case record when we make a determination or decision whether you are disabled.") (emphasis added). Therefore, it is no answer to argue that Plaintiff failed to list each of her impairments in the Disability Report when each impairment was heavily documented elsewhere in the record. Even if the ALJ were permitted to overlook conditions omitted from Disability Reports in the Step Two analysis—which she is not— the ALJ failed to address ODD, which *was* listed in the Disability Report. *See AR* (dkt. 15) at 308.

The holding in *Brown* also defeats Defendant's second argument that Plaintiff lacked authority for the proposition that the ALJ is "required to assess whether each and every medical impairment identifiable from the record is severe." *Def.'s Mot.* (dkt. 27) at 14 (citing *Pl.'s Mot.* (dkt. 20) at 12). In fact, the ALJ's explanation of Step Two analysis describes exactly that requirement. *See AR* (dkt. 15) at 18 ("At Step Two, I must determine whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe' . . . .").

Defendant's third defense of the ALJ's failure to consider Plaintiff's conditions at Step Two appears to be a contention that the ALJ noted Plaintiff's other medically determinable impairments but did not find any of them severe. *See Def.'s Mot.* (dkt. 27) at 14. This argument is likewise without merit because it essentially asks this court to substitute its own judgment and analysis for that which was never rendered by the ALJ. While the ALJ is certainly able to reject evidence of record when making the Step Two determination, the ALJ must, at the very least, provide reasons for doing so. *See e.g. Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("The ALJ may discount testimony from [a physician's assistant] if the ALJ gives reasons germane . . . for doing so" and "the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms.") (internal quotations omitted). Here, the

14

ALJ neither accepted nor rejected evidence of Plaintiff's migraine headaches, GERD, vertigo, hypersomnia, hiatal hernia, pes planus and inward toeing, chronic fatigue, ODD, ADD, and anxiety disorder at Step Two. The evidence was not considered at Step Two at all.

Additionally, "[a]n impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.' S.S.R. No. 96–3(p) (1996)." *Webb*, 433 F.3d at 686. "An impairment or combination of impairments may be found non-severe *only if* the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work." *Id*. (internal citation omitted) (emphasis in original). Step Two then, is "a *de minimis* screening device [used] to dispose of groundless claims." *Id*. at 687 (internal quotation omitted). As mentioned above, because the ALJ's decision made no mention whatsoever of Plaintiff's above-described impairments in the Step Two analysis, it can only be said that these impairments were not considered at all.

It is not for this court to evaluate the ignored evidence in the first instance, assign it weight, and then reweigh it against the other evidence of record, or to provide any *post hoc* justification for the ALJ's failure to consider it at Step Two. Instead, this court is tasked with reviewing the ALJ's evaluation of that evidence. This is why the Commissioner "may not reject 'significant probative evidence' without explanation." *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995) (quoting *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984)). The evidence outlined above should have either been accepted by the ALJ, or specifically rejected with an explanation.

Defendant lastly argues that Plaintiff failed to show that the above-mentioned conditions were "severe impairments" that "*significantly limit[ed]* [Plaintiff's] physical or mental ability to do basic work activities," and that even if the ALJ could have identified additional severe impairments at Step Two, such an oversight is of "no consequence" absent any showing of deficiency in the RFC. *See Def.'s Mot.* (dkt. 27) at 14 (emphasis in original). Defendant's final two contentions cannot be reconciled with binding precedent requiring the ALJ to fulfill a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered. *See Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983); *see also Celaya v. Halter*,

332 F.3d 1177, 1183 (9th Cir. 2003); *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *and Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996). It is the ALJ's responsibility, not the claimant's responsibility, to determine whether an impairment is severe or non-severe, and to explain that determination in the written decision.

Additionally, as to Defendant's contention that such an oversight in the Step Two analysis is of no consequence absent a deficiency in the RFC, even if the Commissioner is correct in asserting that these impairments are retrospectively non-severe, which is by no means a sound conclusion, even a non-severe, though medically determined, condition must be factored into the ALJ's Step Three analysis, as well as in the formulation of the RFC. *See Richard v. Colvin*, No. C13-6055 RBL, 2015 WL 2085610, at *4 (W.D. Wash. May 5, 2015) ("[Thus,] [t]he ALJ's failure to address plaintiff's [conditions] at Step Two indicates that the ALJ may not have accounted for all of plaintiff's impairments during subsequent steps of the sequential evaluation process."). For example, in support of her application for benefits, Plaintiff offered extensive medical evidence regarding her chronic fatigue, ADD, and anxiety disorder, and the effect these impairments have on her ability to function. In his Physical Medical Source Statement, Dr. DeRose opined that, as a result of Plaintiff's impairments, she could only perform "very low stress work," would likely be "off task" more than twenty-five percent of a workday, would likely be absent more than four days per month, and would require ten or more unscheduled breaks of fifteen minutes in length during a workday. *AR* (dkt. 15) at 1102-04. In response to the ALJ's fourth and final hypothetical, which accounted for fewer limitations than those identified by Dr. DeRose above (*see Pl.'s Br.* (dkt. 20) at 16-18; *and AR* (dkt. 15) at 63-73), vocational expert Ann Wallace, PhD, testified that all work would be eliminated. *Id.* at 73.

Moreover, Plaintiff's borderline intellectual functioning, combined with chronic fatigue, ODD, ADD and anxiety disorder, might preclude her from performing the jobs identified in the ALJ's decision. Plaintiff has been repeatedly advised against operating machinery under the use of psychiatric medications (*see, e.g., AR* (dkt. 15) at 932, 1080, 1094) (DOT 585.685-062 Label Pinker); and Plaintiff would likely be unable to use a screwdriver to position screws in rims of balance wheels, multiply and divide tens and hundreds, or perform operations with units such as

16

1 cup, pint, and quart (DOT 715.684-026 Bench Hand); or to possess a vocabulary of 5,000-6,000 words, read at a rate of 190-215 words per minute, or write compound and complex sentences (DOT 209.587-010 Addresser).

Furthermore, the court is concerned about how the Step Two error effected the ALJ's Step Three analysis. The ALJ explained, in pertinent part, that Plaintiff failed to meet Listing 12.04's "paragraph C" criteria because there was "no evidence of repeated episodes of decompensation of extended duration," nor a "residual disease process that . . . would be predicted to cause [Plaintiff] to decompensate," nor a "current history of one or more years' inability to function outside a highly supportive living arrangement." *AR* (dkt. 15) at 21. The ALJ concluded that "there is no evidence that [Plaintiff's] anxiety-related disorder results in a complete inability to function independently." *Id*. at 21-22. However, had the ALJ evaluated all of Plaintiff's medically documented impairments at Step Two, the ALJ would have identified evidence sufficient to prompt an evaluation of whether Plaintiff met Listing 12.04's "paragraph A" and "paragraph B" criteria. For example, Plaintiff provided testimony and medical documentation of depressed mood (*see, e.g., id*. at 401, 433, 437, 439, 473, 498, 568-69, 638, 673, 729, 932, 943, 1070), appetite disturbance with change in weight (*see, e.g., id*. at 673, 1053), sleep disturbance (*see, e.g., id*. at 923, 943, 1109), psychomotor retardation (*see, e.g., id*. at 401, 447, 1037, 1054, 1086), decreased energy (*see, e.g., id*. at 728, 1017), and difficulty concentrating or thinking (*see, e.g., id*. at 827, 1097)—which suggests that Plaintiff could satisfy Listing 12.04's "paragraph A" criteria. In addition, Plaintiff provided testimony and medical documentation evidencing a marked limitation in her ability to interact with others (*see, e.g., id*. at 323, 402), to concentrate, persist or maintain pace (*see, e.g., id*. at 55-56, 827, 1097), and to adapt or manage oneself (*see, e.g., id*. at 351, 353-54, 357)—which suggests that Plaintiff could also satisfy Listing 12.04's "paragraph B" criteria.

Therefore, the court finds that the ALJ's failure to discuss the evidence of migraine headaches, GERD, vertigo, hypersomnia, hiatal hernia, pes planus and inward toeing, chronic fatigue, ODD, ADD, and anxiety disorder in making the Step Two determination was reversible error. The court also finds that it cannot resolve the additional issues raised by Plaintiff until the error in the ALJ's Step Two analysis is corrected. *See Haverlock v. Colvin*, No. 2:12-CV-2393-

DAD, 2014 WL 670202, at *5 (E.D. Cal. Feb. 20, 2014) ("In light of the remand required by the ALJ's error at Step Two, the court need not address plaintiff's remaining claims."). Accordingly, the case must be remanded for further proceedings.

## CONCLUSION

For the reasons stated above, the court **GRANTS** Plaintiff's motion for summary judgment, **DENIES** Defendant's motion for summary judgment, and **REMANDS** this matter for further proceedings in accordance with this Order.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: July 30, 2019

ROBERT M. ILLMAN
United States Magistrate Judge